**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| TONYA RIVES,<br>Plaintiff,<br><br>-vs-<br><br>WHITESIDE SCHOOL DISTRICT NO. 115,<br><br>Defendant. | ) | Case No.: 3:11-cv-01145-GPM-SCW<br>CJRA TRACK: 3<br>Presumptive Trial Month: 9/2013<br><br>Judge: Murphy, Williams |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, WHITESIDE SCHOOL DISTRICT NO. 115, by its attorney, Howard W. Small of the Law Office of Small & Freeman, Ltd., hereby offers this Memorandum to the Court in support of Defendant's Motion for Summary Judgment as follows:

## INTRODUCTION

Plaintiff, Tonya Rives, was hired as a middle school teacher on August 24, 2006 as recommended by Defendant's Superintendent, Peggy Burke. Per Illinois School Code, the Defendant's Board of Education makes all final decisions regarding personnel hiring and retention.

The Illinois School Code provides for four years of probation completed in a satisfactory manner before a teacher is eligible for contractual continued service (tenure). On March 31, 2010 approaching the end of Plaintiff's fourth year of probation Defendant determined that Plaintiff was to be non-renewed. Statutory 45 days notice was given to the Plaintiff in writing. Plaintiff was evaluated during her fourth year in the same procedural fashion as she had been evaluated during each of her first three years. The recommendation for non-reemployment came from Superintendent, Peggy Burke, as well as the Middle School Principal, Mr. Ron Trelow, and also with some input from the Assistant Middle School Principal, Marshaun LeFlore Johnson. This recommendation was made to the Board of Education and the Board adopted the recommendation in a unanimous fashion on 3/31/10. Notice of non-reemployment was promptly given in writing to the Plaintiff, by letter dated April 6, 2010.

Plaintiff had some difficulties during all four of her years, even though she achieved a satisfactory composite rating on her written evaluations. Letters are contained in Plaintiff's personnel file dated 3/19/08 and 9/18/08. The letter of 3/19/08 points out that there are some issues that need to be addressed. This specifically included that some parents have complained that Plaintiff did not treat some students with respect. The letter of 9/18/08 points out some important procedural shortcomings. Further, it points out that Plaintiff was often difficult to contact by parents.

Also contained in Plaintiff's personnel file are three annual evaluations dated 1/15/08, 3/19/09 and 3/25/10. The written evaluation for Plaintiff's first year of employment has been misplaced, although testimony from the Middle School Principal, Ron Trelow, indicates that in fact the evaluation was conducted.

The evaluation dated 1/15/08 rates the Plaintiff in the "satisfactory" category, but also points out some serious deficiencies. For example, in category 15 it points out that Plaintiff has had problems communicating with parents and/or students and/or fellow employees. It points out that there was a big shouting match in the Principal's office when Plaintiff told a parent "well, I see where she gets it from." The evaluator's comments pertaining to category 15 elaborates that Plaintiff gets defense too quickly and raises her voice and that Plaintiff caused the biggest incident the Principal had ever been involved with concerning a parent and a teacher. Category 19 points out deficiencies with lesson plans. The letter in the personnel file dated 3/19/08 is consistent with the evaluation dated 1/15/08 in the categories of lesson plan preparation and dealing with parents and students.

The evaluation dated 3/19/09 gives the Plaintiff an excellent rating overall, but also contains unsatisfactory ratings in two categories. Again, in category 22 the evaluation points out that Plaintiff is sometimes rude to others and only does the minimum required to maintain her certification (category 23).

Then, significantly, the evaluation of 3/25/10 indicates a significant deterioration in performance. The previous year evaluation had a rating of 68, whereas the rating on 3/25/10 was 54. Further, there had not been improvement in the categories previously pointed out as deficient. For example, in category number 7, it was pointed out that Plaintiff re-focuses students sometimes harshly, according to students and parent reports. In category 15, it was pointed out that Plaintiff sometimes gets in shouting arguments with parents as well as students,

and that fellow employees just stay away. In category 17, it was pointed out that Plaintiff almost never participates in issues beyond classroom responsibilities. In category 22, it was pointed out that Plaintiff has inconsistent behavior with colleagues and parents. In category 23, it was pointed out that Plaintiff is seldom seen involved in any personal development activities. In category 25, it was pointed out that Plaintiff is seldom seen outside of minimum required activity. The evaluator's comments included pointing out that Plaintiff had told her class that her toddler was smarter than they are. It was pointed out that she needed to collaborate more with her colleagues, because they felt ignored or disrespected. It was pointed out again that screaming matches with parents cannot be tolerated and that Plaintiff had left some confidential e-mail visible on her computer screen which apparently led the involved student to have disclosed some personal information that was thereby discovered by other students in the class. It was also observed by the Principal that Plaintiff had told her class that if Plaintiff could get a job at a "good school", that she wouldn't be there. Plaintiff, a black female, was observed to have more negative issues with black adults. The Principal had had a parental complaint from a black parent in a very negative fashion, as pointed out on the evaluator's comments on the evaluation.

In summary, problems with rudeness, dealing with students and/or parents and colleagues had spanned Plaintiff's entire period of employment with Defendant. These issues had never been rated satisfactorily. Plaintiff had been cautioned in writing that communications with students and parents needed to be respectful. Nevertheless, in an increasing fashion these issues were deteriorating further.

The Defendant's resolution of non-reemployment dated 3/31/10 sets forth in detail the reasons for non-reemployment. It indicates that Plaintiff had communicated at times unprofessionally with parents, and that she had made inappropriate comments to students in her classes.

Plaintiff alleges in her Interrogatory Answers and in her deposition testimony that she was subjected to different terms and conditions of employment than white teachers. However, documents attached to Plaintiff's deposition indicate that Plaintiff's work conditions were similar or identical to other teachers. Specifically, Plaintiff's work schedule and lunch breaks were virtually identical to those of other middle school teachers.

Plaintiff alleges that she was denied the evaluation process because she was black. To the contrary, Plaintiff was put through the identical evaluation process as all other probationary teachers. She was evaluated in writing on an annual basis. Plaintiff contends that she was evaluated in writing only once, and that two of the three written evaluations were fabrications and were missing from her personnel file. However, there is overwhelming evidence including admissions by Plaintiff herself that in fact all appropriate evaluations were conducted. Plaintiff herself authored a letter indicating that she was evaluated in March, 2010 and she also made several party admissions to her own Teachers Union Representatives to the same effect.

Plaintiff alleges that based upon racial grounds, she was non-renewed from employment in April, 2010. However, Plaintiff has no direct evidence of this. And, to the contrary, all of the direct and circumstantial and documentary evidence is to the contrary. Plaintiff's non-renewal had nothing whatsoever to do with race. Rather, it was the result of continuing shortcomings on Plaintiff's evaluations in certain designated categories. Plaintiff had gone from a 68 rating the prior year down to a 54 rating in 2009-2010. Further, there had been several significant incidents involving students and parents during the most recent academic year. Historically, as pointed out, there had been continuous shortcomings in certain designated categories. Plaintiff's most recent performance indicated deterioration in those categories, not improvement.

The evidence will show that there has been no demonstration by Plaintiff that she met the legitimate job expectations of the School District. Further, there has been no evidence presented by Plaintiff that she was treated differently by the school administration than other teachers in her status. Finally, the evidence will demonstrate that the stated reasons by the School Board for Plaintiff's contractual non-renewal were non-pretextual, in that those reasons were adequately supported by testimony and documentation, and that the stated reasons were believed by the Defendant to be factually based. For these reasons, the evidence will demonstrate that not only has Plaintiff failed to establish a *prima facie* case of racial discrimination/retaliation/sexual harassment, but neither has Plaintiff presented any evidence that the Defendant's stated reasons for contractual non-renewal were pretextual.

**LEGAL POINTS AND AUTHORITIES**

1. The power of a school board not to renew employment of probationary teachers cannot be limited (see 105 *ILCS* 5/10-22.4) (Illinois School Code); see also *Cobden Unit School District #17 v. Illinois Educational Labor Relations Board*, 2012 IL App (1st) 101716, 359 Ill.Dec. 182.

2. Remediation plans only apply to tenured teachers; there is nothing in the statutes requiring a school district to provide a probationary teacher an opportunity to remediate deficiencies before a decision is made not to renew a teacher's employment (see *Cobden* above).

3. Requiring a school district to fully document its reasons for not renewing the employment of a probationary teacher would infringe on the district's duty to ensure that only the most qualified teachers are selected for continued employment after a probationary "tryout" period. (See *Cobden*, above).

4. In Title VII employment discrimination cases, plaintiff may establish the necessary elements of proof either directly or indirectly; in the absence of direct evidence of discrimination, the burden of proof for indirect cases is that the Plaintiff must demonstrate:

1. She is a member of a protected class;
2. She met her employer's legitimate job expectations;
3. She suffered an adverse employment action; and
4. Similarly situated employees outside of the protected class received more favorable treatment.

Further, if plaintiff is able to establish a *prima facie* case of discrimination through this indirect method, the employer may still offer a non-discriminatory reason for the adverse employment action, and if the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext (see *Everroad v. Scott Truck Systems*, 604 F.3d 471 (7th Cir., 2010).

5. To demonstrate a pretext, a plaintiff must show that the employer did not honestly believe in the reasons it gave for non-renewing plaintiff's contract; "pretext" means a dishonest explanation, a lie rather than an oddity or an error; demonstrating pretext requires proof that the

defendant's explanation is unworthy of credence (see *Everroad*, above); see also *Balderston v. Fairbanks Morse Engine Division of Coltec Industries*, 328 F.3d 309 (7th Cir., 2003).

6. An employer's proffered reasons for the purported adverse employment action can be determined as non-pretextual as a matter of law (see *Keeton v. Morning Star, Inc.*, 667 F.3d 877 (7th Cir., 2012); and *Montgomery v. American Airlines, Inc.*, 626 F.3d 382 (7th Circ., 2010).

7. The same legal analysis applies to claims under 42 *U.S.C.* §1981 and Title VII claims (see *Montgomery*, above).

8. Section 10-22.4 of the Illinois School Code (105 *ILCS* 5/10-22.4) authorizes a school district to dismiss a teacher "whenever, in its opinion, he is not qualified... to teach, or whenever, in its opinion, the interests of the schools require it, subject, however, to the provisions of §24-10 to §24-15, inclusive." Section 24-11 of the Code states that a teacher who is employed for four consecutive years enters into contractual continued service in the district unless the teacher is given written notice of dismissal 45 days before the end of the school term (see *Cobden*, above, and 105 *ILCS* 5/10-22.4 and 105 *ILCS* 5/24-11).

**EVIDENCE PRESENTED**

There were a total of 9 depositions taken in this case. They are listed on the Motion for Summary Judgment, and all transcripts are attached to the Motion. Additionally, Plaintiff responded to Rule 26(a)(1) including 214 numbered pages of documents. The disclosure statement is also attached to the Motion, along with one excerpted page, page 58 which is a document Plaintiff produced to Defendant.

DEPOSITION OF PLAINTIFF, TONYA RIVES:

Plaintiff is age 46 (dep. p. 4). Plaintiff's teaching contract with Whiteside School District was non-renewed on March 31, 2010 and Plaintiff was given notice thereof on that date (dep. pp. 7-8). Plaintiff identified Exhibit 12, the April 6, 2010 notice of non-reemployment from the District (dep. pp. 8-9). There is no dispute that Plaintiff was given notice of contractual non-renewal at least 45 days prior to the end of the school term.

Plaintiff claimed in her deposition that she was only evaluated once by Marshaun LeFlore (dep. pp. 12, 14-15); however, as will be pointed out below, there is abundant evidence in the

record, including party admissions from Plaintiff, that she indeed was evaluated in writing on at least three occasions, and in fact on four occasions, except the first year written evaluation has been misplaced.

Plaintiff claims that a Teacher Union official, Mike Murakami, went with her to examine her personnel file sometime between April 1 and May 20, 2010, and that the result of such examination revealed that the file contained only one written evaluation. However, as will be shown below, Mr. Murakami did not inspect the personnel file page by page, and could not say in his deposition that the file contained only one evaluation.

Plaintiff claims on page 22 that her evaluations from 2008 and 2010 were "fabricated"; however, as will be shown below, by Plaintiff's own admissions and by sworn testimony of school officials and others, it will be established that those evaluations in fact took place, were reduced to writing, and were contained within Plaintiff's personnel file. On page 24, Plaintiff initially refused to answer any questions pertaining to the two written evaluations which Plaintiff claimed were fabricated; however, after conference with her attorney she then did answer some questions pertaining to those evaluations. Plaintiff admits on page 25 that she in fact was criticized by the School Principal concerning her lack of providing lesson plans to a substitute teacher. At page 27-28 Plaintiff admits that she never complained to the District Superintendent about her purported lack of being evaluated in writing. At page 30 Plaintiff admits that she does not recall why she did not inquire of the Superintendent about her alleged lack of written evaluations.

On pages 32-33 Plaintiff admits that at least one of the reprimand letters was in fact contained in her personnel file at the time she examined it during April, 2010. Plaintiff admits at page 33 that the reprimand letter dated September 18, 2008 could have been in the file, but denies that the other reprimand letter dated March, 2008 was in the file. At page 33 Plaintiff initially denied that the Teacher Union letter to Plaintiff dated April 19, 2010 had been sent to her; however, this letter, (Eschman deposition Exhibit "2"), is a bate-stamped document, and therefore was provided to defense counsel by Plaintiff's counsel. Eventually, at pages 48-49 Plaintiff admits that she did in fact receive the letter from her Union, and her attorney pointed out to her that the Plaintiff herself had given her attorney this letter.

At pages 38-39 Plaintiff admits that even though she says she was not being annually evaluated, she never complained to the Teachers Union.

At pages 42-43 Plaintiff claimed that her Union Representative told her "you are supposed to be evaluated twice per year", but it is clear under the Illinois School Code that for non-tenured teachers, a once per year written evaluation is set forth. At page 45 Plaintiff says that after her notice of non-renewal, Mike Murakami went through her file with her, "so he witnessed everything that was in my file." However, as will be shown below, Mr. Murakami did not state that that happened, and he admitted that he did not inspect the file closely, and did not go through the file page by page.

At page 52-53 Plaintiff identifies Exhibit "17", a "rebuttal letter" written by Plaintiff to the Whiteside School Board dated April 13, 2010. Significantly, near the bottom of page 2 of that letter Plaintiff states "the other alleged statement that Ms. Burke revealed to me was, on the day Mr. Trelow visited my room to conduct my yearly evaluation, he said he overheard me having an inappropriate conversation with my class." Accordingly, Plaintiff by her own writing admits that Mr. Trelow, the Principal, did in fact conduct a yearly evaluation of the Plaintiff recently. Further, reference should be made to the excerpt of Plaintiff's Rule 26(a)(1) Disclosures, specifically exhibit "L" to the Motion for Summary Judgment, attaching bate stamped page number 58, reflecting that Plaintiff was in possession of a memo from Marshaun LeFlore regarding her spring 2010 evaluation, and scheduling the evaluation, ultimately, for March 25th. Further, as will be shown below, there is testimony from Sheryll Kosydor indicating that Plaintiff told her on more than one occasion that in fact Plaintiff had been evaluated by District personnel on four occasions, including the occasion during March, 2010.

On page 59 Plaintiff admits that she drafted Exhibit "17", the April 13, 2010 letter.

Plaintiff admits on pages 65-66 that even the evaluation from Marshaun Johnson contained two categories that were rated unsatisfactory. Plaintiff at page 69 admits that although she was given the opportunity, she did not write any rebuttal comments upon the evaluation wherein Marshaun Johnson rated those two categories unsatisfactory.

Plaintiff generally at pages 77-85 was asked whether any School District administrators ever acted in a racially biased way toward her. The three administrators are Marshaun LaFlore (Johnson), Ron Trelow and Peggy Burke (dep. p.78). Plaintiff admitted at page 78-79 that none of the three ever said anything racial to her. She was then specifically asked about her answer to Defendant's Interrogatory number 3 (Exhibit "10") and explained that the statement therein attributable to Trelow "wasn't a racial statement by him." Plaintiff admitted at page 79 she had

never had any contact with Board Members, and could not even identify any of them. Plaintiff then over the next few pages makes comments in part about staff members, who are not part of the District administration. At pages 82-84 she tries to say that Mr. Trelow, the Principal, did not purchase enough testing supplies on occasion, and that sometimes she came up short. However, Plaintiff has no way of establishing whether this only happened to her, or happened to a number of other teachers as well. Further, Plaintiff has no knowledge as to whether this was intentional on the part of Mr. Trelow, assuming only for the sake of argument that this in fact happened, which Mr. Trelow denied anyway in his deposition. Specifically, all that Plaintiff could allegedly establish is that in her opinion there were not enough overall supplies purchased, but not that Plaintiff, alone, came out any differently than a number of other teachers.

At pages 86-87 Plaintiff admits that the criticism contained in the reprimand letter dated September 18, 2008 (Eschman dep. Exhibit "1") was in fact well founded. At page 88 Plaintiff, therefore, admits that that criticism was not racially motivated.

At pages 92-93 Plaintiff admits that on occasion there were situations when her voice was raised with respect either to a student or a student's parent.

Plaintiff admits on page 98 that the contractual non-renewals of two Caucasian teachers ostensibly similarly criticized was legitimate and non-discriminatory. At pages 100-101 Plaintiff recognizes that non-renewal does not automatically mean that it was based upon discrimination; and Plaintiff acknowledges that the two Caucasian teachers were "involved in incidents that caused them to be removed."

At page 103 Plaintiff identifies her Interrogatory Answers (Exhibit "10"). Significantly, Plaintiff claimed in response to an interrogatory that her recent divorce was caused by her contractual non-renewal which had occurred two years before the divorce. Defense counsel inquired of Plaintiff whether there perhaps could have been other reasons for the divorce, other than Plaintiff's employment situation. One of the questions was whether Plaintiff had ever had an extra marital affair. Plaintiff's answer was "I don't recall" (dep. p. 110). Defendant points out this answer as well as several previous answers given by Plaintiff under oath which are either blatantly untrue or at the very minimum inherently incredible.

At pages 127-137 Plaintiff was asked about her allegation that Marshaun Johnson had sexually harassed her, and according to Plaintiff, Plaintiff's rejection of Johnson's overtures was the reason that Johnson recommended against Plaintiff for contract renewal. The facts establish

that Johnson evaluated Plaintiff on only one occasion, March, 2009 (Exhibit "6"). The other two evaluations performed in 2008 and 2010 were performed by Principal, Ron Trelow (Exhibit "7" and "8"). The alleged sexual harassment according to Plaintiff took place during early 2010 (dep. pp. 134-135). Plaintiff then says on page 137 that "the only reason" why the District non-renewed her was based on the recommendation from Marshaun Johnson, but as will be shown below, that is nowhere near the truth. The evaluating administrator in 2010 was Ron Trelow, not Marshaun Johnson. Johnson may have had some input into the overall decision in 2010, but the decision was made in unison between the Superintendent, Peggy Burke, the Principal, Ron Trelow, and with whatever input Johnson may have provided. Further, as Defendant points out again, this theory of the case of sexual harassment/retaliation is the subject of a defense Motion to Dismiss, so these references to this subject matter are for historical purposes only, and should not be a suggestion to the Court that these theories should be entertained.

At page 168 Plaintiff gives her "theory" that the Superintendent, Peggy Burke, ordered the Principal, Mr. Trelow, to fabricate the 2010 evaluation. However, Plaintiff has shown no evidence to support this.

At pages 169-172 Plaintiff once again demonstrates the inherent lack of credibility in her testimony. Exhibit "21" is a subpoenaed Police Department report which eventually led to a court hearing wherein Marshaun Johnson petitioned for an Order of Protection against Plaintiff. A transcript of that hearing was obtained by defense counsel and produced in discovery to Plaintiff. One of the witnesses testifying was Sandra Watt. Plaintiff was asked about Watt's testimony and Plaintiff tried to deny that Watt had even testified as a witness at the hearing. Plaintiff's attorney tried to correct the Plaintiff but Plaintiff at first insisted that the witness was not there. Eventually, Plaintiff admitted the possibility that perhaps Ms. Watt did testify after all.

At page 200 Plaintiff admits that whether or not she was entitled to a mentor, she never asked for one at any time. At page 201 Plaintiff tries to say that Mr. Murakami went through her personnel file "page by page", but as will be shown below, Murakami testified otherwise in his deposition.

At page 214 Plaintiff admits that even though she is claiming that she received shorter lunch breaks than other teachers, she could not say that her lunch break was shorter than all of the other teachers. As will be shown below, Plaintiff in fact received a 31 minute lunch break, which was not only identical to other teachers having similar schedules, but also complied with

State law. At page 217 Plaintiff admits that she never really learned how to use the Promethean Boards, and at page 218 she admits that the recent criticism of her in the latest written evaluation was arguably justified, because Plaintiff admits it was a mistake for her to leave the computer display up on the screen.

DEPOSITION OF RONALD TRELOW:

Ron Trelow is the Whiteside School District Middle School Principal, and he is in his tenth year in that position. He has been the Middle School Principal the entire time that Plaintiff has been employed with the District (dep. pp. 6-7). At page 8 he gave the reasons for Plaintiff's non-renewal as difficulty getting along with staff, parents, returning parent contacts, difficulty getting along with parents, students, staff mates. He testified on page 11 that it would have been the administrative team recommendation that led to her contract non-renewal. At page 12 he indicated there was a consensus among himself, the Superintendent and the Assistant Principal, Marshaun Johnson. At page 13 he indicated that there were discussions throughout the year as to whether renewal would be granted. The substance of the discussion was that Plaintiff continued to be unpredictable in dealing with people.

Mr. Trelow at pages 14-15 described a meeting in particular wherein Plaintiff brought her Union Representative and became extremely loud, and arguing that she had not committed the offense criticized. (Plaintiff in her deposition eventually did admit that she was at fault, at pages 86-87). Trelow testified at pages 15-16 that there were a number of discussions with students' parents about Plaintiff not communicating with the parents. At page 22 Mr. Trelow discusses the incident that took place only shortly before the non-renewal, whereby Plaintiff left a confidential parent e-mail on her computer screen in her classroom. At page 31 Trelow refers to a number of parents complaining that Plaintiff did not treat their children respectfully. Regarding the length of Plaintiff's lunch breaks, he indicated at page 32 that they are basically all the same length. At page 36 he indicates that none of the teachers got a designated lunch break longer than 30 minutes. At page 38 he compares Plaintiff's teaching schedule with other teachers, concluding that hers was no more burdensome than anyone else's. At pages 40-41 he indicates Plaintiff got the same length lunch break as everyone else. (At pages 99-100 the witness clarifies that Plaintiff's counsel miscalculated the period of the lunch break, the actual period being 31 minutes not 25 minutes). At page 48 he clarifies that several teachers have classrooms that are used during their plan time, and the situation was not unique to Plaintiff. At page 54 he clarifies

that for probationary teachers, only recently did they have a mentor program, but not at the time that Plaintiff was employed. At page 59 he indicates that evaluations are performed once per year for probationary teachers. At page 65 he indicates that of the four years Plaintiff was employed, he personally performed three evaluations. The fourth evaluation was performed by Marshaun Johnson (dep. p. 60). At pages 65 and 68 he identifies the two written evaluations that he did that were in the personnel file. At pages 70-71 he indicates that the first year evaluation, although performed by him, was misplaced. At page 71 he clarifies that it was a cumulative effect of Plaintiff's behavior that caused the ultimate non-renewal decision. At page 72 he clarifies that he wanted to give the Plaintiff every opportunity, because she was having some medical issues and he was not sure what was causing some of her erratic behavior. At page 74 he indicates that Marshaun Johnson became Assistant Principal after five years with the District, and she was tenured at the District at that time.

At page 79 he indicates that there are two African-American teachers in the Whiteside School District, as of the date of his deposition. Added to that would have been the Plaintiff during the time she was employed, and also Marshaun Johnson before she left the Whiteside School District in July, 2010. Marshaun Johnson is a black female (dep. p. 81). At pages 87-89 he indicates that comparing the written evaluations side by side, Plaintiff was deteriorating in her overall score, and certainly in the categories that had previously been rated as unsatisfactory. At page 90 he identifies Eschman deposition number 1 as the letter which preceded the shouting episode in Trelow's office involving the Plaintiff. At page 93 he describes the Plaintiff's demeanor at that time as being very loud, very agitated. Plaintiff was the only one at the meeting doing any shouting. At page 95 he outlines an episode where Plaintiff was arguing with a student's parent. This argument took place in early 2010, shortly before the non-renewal. It was so loud that the custodians came down to his office to summon him.

At page 99 he indicates that Plaintiff did not receive any heavier workload than similarly situated teachers. Her lunch period was the same as anyone else's. He was shown at page 102 Plaintiff's entire list of complaints contained in her Response to Interrogatory number 3 (Exhibit "10"). He expressly disagreed with everything on that list. At page 107 he indicates that written evaluations were conducted on Plaintiff every year she was employed. At page 108 he indicates that the mentor program for probationary teachers only began in 2012, and did not exist at the time of Plaintiff's employment. At pages 108-109 he expressly rejected any suggestion he had

ever made any racially biased statement to Plaintiff. At pages 110-112 he explains the desire of himself and the District to actually increase the number of black teachers, and he explains his understanding as to why the District does not currently have more black teachers.

At page 119 he indicates he was totally unaware until very recently of any allegation that Marshaun Johnson had sexually propositioned the Plaintiff. At page 123 he indicates there are no designated supplies for testing, and does not really understand Plaintiff's complaint in that regard.

DEPOSITION OF PEGGY BURKE:

Peggy Burke has been the Superintendent of Whiteside School District since 2003 (dep. p. 4). She has never done any formal evaluations on Plaintiff (dep. p. 9). The only time she would review evaluations is if they are looking at whether they are going to retain someone in employment (dep. p. 11). Ms. Burke is one of the approved evaluators for the District. At page 16 she indicates that she may or may not have looked at the Plaintiff's evaluations at the time the reasons on the notice of non-renewal were formulated. At page 24 she explains that for a fourth year probationary teacher, written reasons need to be stated, but this is not to be confused with giving "cause." It is simply a statement of reasons. At page 25 she explains that at the time of Plaintiff's employment, there was no formal mentoring program because there were no appropriations for it.

At page 32-33 Ms. Burke indicates that with Plaintiff, the District was trying to make things work. However, each year she received evaluations that communication was bad, lesson plans weren't always there, and those things never improved.

At pages 36-37 she explains that the ultimate decision regarding Plaintiff was a work in progress, and that discussions had also been held the prior years as to whether to renew. At the end of the Plaintiff's fourth year she met with Marshaun Johnson and also had a discussion with Ron Trelow, and they were all in agreement regarding the non-renewal.

At page 39 Ms. Burke indicates that she had no prior knowledge, and still no current knowledge, as to Marshaun Johnson's sexual preference. She was totally unaware of any solicitation of Plaintiff purportedly by Ms. Johnson. Again, Defendant mentions this only for historical background, and points out that there is a pending Motion to dismiss the Counts in Plaintiff's Amended Complaint for sexual harassment and retaliation.

At page 51 Ms. Burke indicates that in fact when she collected written evaluations at request of defense counsel for production in the lawsuit, she went to the personnel file and they were all there. At page 53 she clarifies that in terms of workload, Plaintiff's workload was identical to other similarly situated teachers. The same was true as to Plaintiff's lunch breaks. At pages 53-54 she went through the calculation of those breaks. At page 52 she identifies the District's Equal Employment Opportunity and Minority Recruitment Policy. At page 58 she reiterates that the District would actually like to hire more minority and black applicants. At page 59 she expresses her agreement with Mr. Trelow's analysis as to why, historically, they have not had more black applicants in the District.

DEPOSITION OF MARSHAUN JOHNSON (formerly Marshaun LeFlore):

Marshaun Johnson, formerly Marshaun LeFlore, began her employment at the Whiteside School District in fall, 2003 as a teacher, and in 2007 she was promoted to Assistant Principal. Her promotion was recommended by Ron Trelow and Peggy Burke. (Dep. pp. 6, 9, and 10). At pages 12-13 she identifies the single evaluation she did, during 2009, and indicates that was the only one she performed. At pages 14-15 she indicates that she only had a business relationship with the Plaintiff. At pages 17-18 she denies any sexual relationship with or solicitation of Plaintiff (again, Defendant makes reference only as a matter of historical background, and points out that there is a pending Motion to dismiss the sexual harassment and retaliation Counts).

At pages 18-19 she relates a serious, recent episode with a student's parent involving the Plaintiff, and the reporting of that episode to the Principal, Mr. Trelow. At page 20 she clarifies that she reported the episode to her superiors, and her superiors made the recommendation of non-renewal.

At pages 22-23 she indicated that at the time of her evaluation in 2009 she indicated to the Plaintiff that she needs to be careful with some of the things that she says to students. At page 25 she pointed out on the written evaluation that Plaintiff was occasionally rude to others. At page 26 she clarifies that Ms. Burke, the Superintendent, makes the non-renewal recommendation to the Board, and the Board then makes the formal decision. At page 29 she identifies herself, for the record, as a black female. She also indicates that she acquired tenure at Whiteside School District during the 2007-2008 school year. She left the District in July, 2010.

On pages 29-30 she indicates that she never became aware of any racial bias being directed against the Plaintiff. At page 32 she clarified that the parental complaint which she

became aware of in early 2010 would have been the same type of conduct for which Plaintiff was rated as unsatisfactory in Johnson's 2009 evaluation.

DEPOSITION OF VICKI ESCHMAN:

Vicki Eschman is a third grade special education teacher at the Whiteside School District, and began back in 1984 with the District. From 2000-2008 she was the Co-President of the Whiteside Teachers Union and at the time of Plaintiff's non-renewal in 2010, she was a Union Representative (dep. pp. 5-7). Eschman was present at a meeting during the 2007-2008 school year involving Plaintiff, Superintendent Burke, Principal Trelow and herself. She had an independent memory of that meeting (dep. pp. 8-9). The subject of the meeting was a situation that occurred when Plaintiff was out sick. The administration was questioning whether Plaintiff had left sub plans and/or a class roster for the substitute teacher (dep. p. 13). Eschman's purpose at the meeting was to advocate on behalf of Plaintiff. Plaintiff got upset, and eventually Eschman stood up and said "Tonya, let's go. The meeting is over." (Dep. p. 14). Eschman indicated on page 21 that some teachers have a 30 minute lunch break, and at other times of the day have 15 or 20 minutes in some other fashion, "but it all kind of evens out..." (dep. p. 21). At page 22 she clarified and said that every teacher has at least a half hour for lunch. Further, throughout her career she has had another teacher come in to use her currently occupied classroom for various other purposes, but that does not interfere with her own ability to use that same classroom for her own plan time (dep. pp. 22-23). Eschman was then shown Exhibit "1" to her deposition. That is a letter dated September 18, 2008 directed to Plaintiff from Mr. Trelow. Eschman then eventually concluded that it was the September 18, 2008 letter that prompted the meeting which she attended (dep. pp. 25-26). At page 27 she went on about the events at the meeting and that "Tonya definitely was raising her voice" and that no one else at the meeting was doing so. Eschman then at page 28 was asked about the allegations of the Plaintiff's complaint against the School District. She testified that she was not aware of any words or behavior of any administrator or supervisor in the District that she would characterize as racially discriminatory against Plaintiff. Further, Plaintiff had never complained to her that she had been the victim of racial discrimination (dep. p. 28). Eschman was then shown Exhibit "2", attached to her deposition. Exhibit "2" is the Union letter to the Plaintiff dated April 19, 2010. Eschman was on the Union Grievance Committee at that time (dep. pp. 29-30). At pages 30-31 she indicated that she was unaware that the Whiteside administration had ever treated Plaintiff

differently concerning the duration of her lunch break or with respect to the amount of classes that Plaintiff was to teach (dep. pp. 30-31). At page 36 Eschman indicated that she has no knowledge of any failure on the part of the School District to conduct an annual written evaluation upon the Plaintiff. At page 38 she indicates she has no awareness of any practice on the part of the District to not hire black administrators or black teachers. At page 41 Eschman testifies that two black teachers to her knowledge have received tenure over the years.

DEPOSITION OF SHERYLL KOSYDOR:

Sheryll Kosydor has been at the Whiteside School District since 1989 and in the year 2010, she was a Co-President of the Teachers Union. Kosydor was shown Exhibits "23" and "25" and as to Exhibit "23", she shared information with Linda Baldwin and believes that Baldwin prepared the actual exhibit. With respect to Exhibit "25", her best memory is that her and Linda Baldwin may have prepared Exhibit "25" together, although it is possible that Kosydor herself may have prepared the exhibit; in any event, the handwriting that is on Exhibit "25" is Kosydor's handwriting (dep. pp. 6-7). Kosydor did in fact prepare Exhibit "26". With respect to Exhibit "27", the handwritten portion of Exhibit "27" was written by Kosydor. (Dep. pp. 7-8). Regarding the written teacher evaluation performed in March, 2010, Kosydor testified that Plaintiff directly told her that Mr. Trelow had evaluated her at that time (dep. p. 9). In fact, Plaintiff was more specific and indicated the evaluation took place on March 25, 2010 (Defendant points out that that in fact is the date on Trelow's evaluation during March, 2010). Kosydor did not personally ever examine the original personnel file for Plaintiff. (Dep. p. 13). Kosydor recalls the Union writing Plaintiff a letter (Exhibit "18") which in part advised Plaintiff against sending her "rebuttal" letter to the District, because the Union Grievance Committee "felt that the information justified the allegations from the District" (i.e., reasons for contractual non-renewal). (Dep. p. 15). At page 16 Kosydor reiterates that Plaintiff told her that Mr. Trelow evaluated her on 3/25/10. At page 17 Kosydor indicates that Plaintiff was abrasive with her. At page 19 she indicates that the Grievance Committee decided there was nothing that was grievable. She explained that in order to have a grievance, there has to be some sort of violation of contract or a misinterpretation or an inequality of the way a Union member was treated and that the Union found none of that. On page 23 Kosydor reiterates that Exhibit "26" was written by her. On page 27 she indicates that based upon her documentation (Exhibit "26") Plaintiff had stated to her that Plaintiff had been evaluated four times (see also pages 31-32). At pages 33-34

Exhibit "26" indicated that Plaintiff had told Kosydor that Plaintiff in fact had an evaluation scheduled for March 25, 2010. Then, Kosydor was asked about a number of corroborating incidents, to verify or not verify the overall allegations of the District that Plaintiff had periodically acted inappropriately. (Pages 35-40 of the deposition outline that investigation). On page 44 she indicated no awareness of any unequal terms of employment directed toward Plaintiff, and no awareness of any harassment or racial discrimination directed against Plaintiff. On pages 44-45 she indicates that the Union investigation into Plaintiff's complaint of non-renewal revealed some episodes of rude or abrasive behavior on the part of Plaintiff. (Dep. pp. 44-45).

DEPOSITION OF KIM BRUSH:

Brush has been with the Whiteside School District for 28 years. In 2010 she was Chairman of the Teachers Union Grievance Committee. She did not have much communication with Plaintiff prior to April, 2010 (dep. pp. 4-5). The only document created by Brush was Exhibit "18", the Union letter to Plaintiff dated April 19, 2010. (Dep. p. 6). She was shown the event timeline, Exhibit "25", and asked whether she saw anything inaccurate in that exhibit, and replied that she did not (dep. p. 9). In the 4/19/10 letter the Union told Plaintiff there was no grievable conduct (dep. pp. 12-13). The Union was telling the Plaintiff that the District was within its rights to non-renew the Plaintiff as a fourth year teacher. Brush was not aware of any discriminatory behavior directed against the Plaintiff by the District, was unaware of any unequal terms of employment, and was unaware of any harassment directed against the Plaintiff by the School District administration (dep. pp. 13-14). On pages 17-20 Brush outlines the investigation conducted by the Union and sets forth events which Defendant suggests to the Court corroborate the stated reasons the District gave for Plaintiff's non-renewal. At pages 26-28 she indicates that Plaintiff never advised the Union of any claim of racial discrimination. The first Brush heard of any discrimination claim is when the Plaintiff sued the Union in October 2010 before DHR/EEOC (see Exhibit "24"). On page 29 Brush outlines her communication with a teacher indicating misconduct by Plaintiff. On page 31 there was another episode involving a different teacher telling Brush about another episode of misconduct on behalf of Plaintiff.

DEPOSITION OF LINDA BALDWIN:

Linda Baldwin is Field Service Director for the Illinois Federation of Teachers, office located in Fairview Heights, Illinois. On page 51 Baldwin describes that the Illinois Federation

of Teachers (IFT) is the umbrella organization over a number of local teacher unions, of which Whiteside Federation of Teachers is one. Each local union has its own autonomy. Baldwin prepared Exhibits "23" and "27", which has some handwritten comments on the first two pages (but the handwriting on page 3 of that exhibit is not hers) (dep. pp. 6-7). The exhibit was directed to Mr. Lee Wilson, Director of Field Operations for IFT. Most of the information on Exhibit "27" came from Sheryll Kosydor and/or Kim Brush. At one point Baldwin saw what purported to be Plaintiff's personnel file, but she had no knowledge as to whether that file was complete (dep. p. 20). At page 23 Baldwin indicated that she was not aware through any investigation that Plaintiff had been the victim of racial discrimination by the Whiteside School District. At page 24 Baldwin indicates that she herself is an African-American female. At page 30 Ms. Baldwin indicated that the substance of Exhibit "23", her memo to Mr. Wilson, was accurate to the best of her knowledge, although most of the information therein was reported to her by others.

## ARGUMENT

Defendant suggests that there is no direct evidence of discrimination. Accordingly, pursuant to applicable case law, Plaintiff must resort to the indirect method of proof. That method is outlined in the *Everroad* case. Defendant suggests that Plaintiff cannot prove element numbers 2 and 4, specifically that Plaintiff met her employer's legitimate job expectations, and that similarly situated employees outside of the protected class received more favorable treatment. In any event, even assuming theoretically that Plaintiff could establish those elements, the employer has offered legitimate, non-discriminatory reasons for non-renewal, specifically those reasons outlined in Exhibits "12" and "13", the District's notice letter to Plaintiff of non-reemployment dated April 6, 2010, in conjunction with the District's resolution authorizing non-reemployment of full time, fourth year, non-tenured teacher. Once those reasons are offered, the burden of proof shifts back to the Plaintiff to submit competent evidence demonstrating that the employer's explanation is a pretext. There is not a shred of evidence in this record supporting pretext.

To be clear, Defendant suggests that the issue does not boil down to whether in fact, in truth, Plaintiff did behave rudely or inappropriately, or did in fact commit any of the other acts outlined as reasons for non-renewal; rather, the proper inquiry is whether the Defendant

"honestly believed" in the reasons it gave for non-renewal. Therefore, the case does not come down to an investigation as to whether the Defendant was correct in its reasons; rather, it is a matter of whether the Defendant had a sincere belief in its reasons.

There is abundant evidence in the record demonstrating corroboration for the reasons given by the employer. It does not matter whether the Plaintiff herself believes that those reasons were accurate. The proper inquiry is whether the employer gave legitimate, non-discriminatory reasons for its actions, and whether it had a sincere belief in those reasons.

In *Keeton* the employer was granted summary judgment in a race discrimination and retaliation claim. Among other things, the *Keeton* court stated that in its discretion, the court may skip over the initial burden-shifting of the indirect method and focus on the question of pretext (see discussion at notes 10-13). The court continued that to demonstrate pretext, the plaintiff must show that her employer did not honestly believe in the reasons it gave for its actions. The *Keeton* court held, as a matter of law, that plaintiff had not put forth any credible evidence establishing pretext. Accordingly, her claims failed as a matter of law.

In *Balderston*, plaintiff sued for age discrimination but the employer was granted summary judgment. The court at note 19 discusses in detail the concept of pretext. To show that the employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake, or that the employer's reason was not good enough to support its decision. Plaintiff must produce evidence tending to prove that the reasons are factually baseless, or not the actual motivation for the discharge in question, or were insufficient to motivate the discharge. The court went on to say that the reasons may be "foolish or trivial or even baseless", but that does not establish pretext. The court cited precedent that employers may terminate competent employees simply because they do not like them. Further, facts, not an employee's perception and feelings, are required to support a discrimination claim. The court continued that a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination. The court concluded by stating that although plaintiff in *Balderston* might have wished the court to review the employer's decision on the merits, "this court does not sit as a super-personnel department that re-examines an entity's business decisions."

## CONCLUSION

In summary, Plaintiff's claims fail as a matter of law because Plaintiff cannot establish direct evidence of discrimination, Plaintiff cannot establish the necessary elements of an indirect case of discrimination, and finally aside from anything else, Plaintiff has introduced no evidence that the employer's stated reasons for non-renewal were pretextual. There are no genuine issues as to any material facts concerning these points, and therefore Defendant is entitled to summary judgment on Counts I-IV of the Amended Complaint.

s/ **Howard W. Small**
Howard W. Small, Illinois Bar No.: 2636271
Attorney for Defendant Whiteside School District #115
Law Office of Small & Freeman, Ltd.
41 East University Avenue, Suite 3D, P.O. Box 1337
Champaign, IL 61824-1337
Telephone: (217) 954.0635
Facsimile: (217) 954.0659
E-mail: hws@smallandfreemanlaw.com

**Designation of lead counsel: Howard W. Small is hereby designated as lead counsel responsible for receipt of telephone conference calls and other necessary communications from the Court.**

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jason R. Craddock, Esq., captain1970@thelifeline.net

s/ **Howard W. Small**
Howard W. Small, Illinois Bar No.: 2636271
Attorney for Defendant Whiteside School District #115
Law Office of Small & Freeman, Ltd.
41 East University Avenue, Suite 3D, P.O. Box 1337
Champaign, IL 61824-1337
Telephone: (217) 954.0635
Facsimile: (217) 954.0659
E-mail: hws@smallandfreemanlaw.com